T.C. Memo. 1997-313


UNITED STATES TAX COURT


HOWARD PONTIAC-GMC, INC.,
D.B.A. BOB HOWARD AUTOMALL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4972-95.                    Filed July 7, 1997.


<u>Randall K. Calvert</u>, for petitioner.

<u>David G. Hendricks</u> and <u>Michael J. O'Brien</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income tax of $4,689 and $24,367 for the 1990 and 1991 tax years, respectively.  Petitioner purchased the inventories (parts, accessories, new and used cars) of Dave Markley Jeep-Eagle, Inc. (seller).  Pursuant to a sales

agreement, John David Markley (Mr. Markley), the sole shareholder and president of seller, terminated his Jeep-Eagle franchise with Chrysler Corp. (Chrysler) and granted petitioner a covenant not to compete. Petitioner acquired the relinquished franchise from Chrysler. The sole issue for decision is whether the fair market value of the covenant not to compete (sometimes referred to as the covenant) is $490,000, as petitioner contends, $125,000, as respondent contends, or some other amount. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner (sometimes referred to as buyer) is a corporation whose home office and principal place of business was in Oklahoma City, Oklahoma, at the time it filed the petition in this case. Petitioner filed Forms 1120, U.S. Corporation Income Tax Return, for the taxable years 1990 and 1991[1] with the Internal Revenue Service Center, Austin, Texas. Petitioner had a calender yearend.

### Mr. Markley's Ability to Compete

Mr. Markley entered the automobile dealership business in the mid-1960's. He purchased a Ford dealership in Yukon,

---

[1] Unless otherwise indicated, all descriptions pertain to the years in issue.

Oklahoma, in 1968 and a Ford dealership in Dallas, Texas, in 1975.  He was the sole shareholder and dealer of the Yukon and Dallas dealerships.  Both of these dealerships were successful, and Mr. Markley enjoyed a good reputation within the industry with his customers.  As a suburban Oklahoma Ford dealer, Mr. Markley was a competitor of Oklahoma City dealerships, and was consistently ranked among the top two or three truck dealers in the Oklahoma City metro area (out of seven dealerships).  In 1980 and 1981, Mr. Markley sold the Dallas and Yukon dealerships.

In May 1988, Mr. Markley reentered the automobile dealership business when Chrysler awarded him a Jeep-Eagle franchise in Oklahoma City.  He acquired the Jeep-Eagle franchise directly from Chrysler.  The seller's sales and service agreement with Chrysler (the franchise) was not transferable and was conditioned upon the continued performance of day-to-day management duties by Mr. Markley.

Mr. Markley was a successful Jeep-Eagle dealer in the Oklahoma City market.  His overall vehicle sales averages exceeded his market share responsibility as determined by Chrysler.  Mr. Markley's name was known in the Oklahoma City market as a result of his 14 years of advertising as a Ford dealer in Yukon, Oklahoma (a suburb of Oklahoma City).

At the time of the sale to petitioner, Mr. Markley intended to stay in the Oklahoma City area.  He was 49 years old, in good health, and intended to expand an existing used car and finance company business in Oklahoma City.

Mr. Howard

At the time of the agreement, Robert E. Howard II, was the sole shareholder and CEO of petitioner. He was 43 years old. Mr. Howard has been in the automobile business all his life. He began working in his father's car dealership as a teenager. In 1971, at age 24, Mr. Howard began working for Bob Moore Cadillac. Bob Moore is a "mega dealer"[2] who has assisted a number of other individuals in acquiring dealerships, all of whom have been successful and some of whom have become mega dealers in their own right. Mr. Howard worked his way up to the position of sales manager for Bob Moore Cadillac and in 1973, at the age of 26, was the youngest metropolitan Cadillac sales manager in the United States. In 1973, Mr. Howard was promoted to general manager of a Chevrolet dealership owned by Mr. Moore.

In 1978, at age 31, Mr. Howard purchased an interest in a Pontiac-GMC dealership (petitioner) in Edmond, Oklahoma. By 1980, Mr. Howard had become the sole shareholder of petitioner.

Bob Howard Automall

By 1982, petitioner had obtained the rights to represent Subaru, Mazda, and Yugo. In 1986, Mr. Howard acquired 10-1/2 acres of land in Oklahoma City (the site). Mr. Howard constructed three automobile sales facilities and a parts and service facility on the site which became known as the Bob Howard Automall (the automall). Mr. Howard devoted all of his time to

---

[2] The term was used, but not defined, by the parties. We use the term to mean a very large automobile dealership.

the operations of petitioner from 1978 through 1991. Mr. Howard has been president and general manager of petitioner since 1978. By 1988, petitioner, primarily through the efforts of Mr. Howard, had become the number 2 volume sales leader for Pontiac and GMC trucks in the State of Oklahoma. By 1988, petitioner had also become the number 1 volume retail sales leader in the State of Oklahoma for Mazda, Subaru, and Yugo.

The facilities at the automall were approximately twice as big as were needed for petitioner's operations. Petitioner was very successful with the vehicle lines represented; however, the overhead expense from the oversized facilities made the acquisition of other vehicle lines very important to petitioner. In 1988 and 1989, Mr. Howard was actively seeking additional automobile lines from other manufacturers for his automall. Mr. Howard talked to manufacturers about new dealerships that might be awarded in the Oklahoma City area.

Mr. Howard was also looking for dealerships whose assets could be acquired without the necessity of having to enter into an agreement to lease or purchase the real estate where the dealership was located. In approximately 1988 or 1989, petitioner became very interested in the possibility of representing Dodge, Chrysler-Plymouth, or Jeep-Eagle. Petitioner could not operate a Jeep-Eagle distributorship without a Jeep-Eagle franchise.

## The Sale and the Agreement

Petitioner wanted to acquire the Jeep-Eagle franchise held by seller. Seller's business premises were located approximately 2 miles from petitioner's automall. In late 1989, Mr. Howard (on behalf of petitioner) and Mr. Markley (on behalf of seller) began discussions regarding the possibility of petitioner acquiring certain assets of seller. By November 1989, Mr. Howard and Mr. Markley agreed that petitioner would acquire the inventories (the new cars, used cars, and parts inventory) of seller. Petitioner did not purchase or utilize seller's location in any way. Petitioner was prohibited from using the Markley name.

Mr. Howard and Mr. Markley contacted their attorneys, who had not been involved in the negotiations up to that point, and asked them to draft an agreement (the agreement) which embodied the terms on which they had agreed. At the time they were memorializing the agreement, the attorneys suggested to the parties that they should allocate $10,000 to goodwill. Accordingly, the parties allocated $490,000 to the covenant and $10,000 to goodwill.

The final draft of the agreement provided for the purchase of parts and new vehicle inventories based upon manufacturer's price lists and invoices and the purchase of used car inventories based upon the agreed value of each vehicle at date of closing. Petitioner would not agree to purchase the fixed assets of seller. The total consideration paid was approximately $2.5 million, allocated by buyer and seller as follows:

```
Inventories                 $2,000,000
Covenant not to compete        490,000
Goodwill                        10,000
Total sales price            2,500,000
```

Petitioner and seller signed the agreement on November 15, 1989.  The form of the covenant not to compete was attached as schedule 1 to the agreement.  Section 10 of the agreement provided:

> The Buyer [petitioner] agrees that Buyer will not use Seller's name or location in Buyer's operation.  The parties acknowledge that any goodwill to be acquired by Buyer is nominal and have therefore agreed that the Buyer will pay Seller Ten Thousand Dollars ($10,000) for Seller's goodwill on the closing date.

For payment of $500,000 (over and above the agreed upon sale price of the tangible inventories of seller's Jeep-Eagle distributorship), petitioner received a number of benefits, including seller's agreement to terminate its Jeep-Eagle franchise, and seller's agreement to provide to petitioner all sales and service records, customer lists, and other information which might be useful to petitioner.

Seller's termination of its sales and service agreement with Chrysler was a condition to the closing of the agreement. Approval of petitioner's application for a Jeep-Eagle franchise from Chrysler was also a condition to the closing of the agreement.  Petitioner could only acquire seller's Jeep-Eagle franchise if seller would agree to terminate the franchise.

Chrysler's Franchise Policies

Standard Jeep-Eagle franchises are issued for an indefinite term.  A Jeep-Eagle franchisee can expect to retain its franchise

rights under standard franchise for as long as it meets the terms of the franchise agreement.  Chrysler reserves the right to independently evaluate all dealer candidates and accept or reject candidates based upon its sole discretion.  Success in obtaining a Jeep-Eagle franchise is not assured, even for an individual with Mr. Howard's demonstrated abilities.

Mr. Howard's Application for a Chrysler Franchise

In obtaining approval by Chrysler of Mr. Howard and petitioner as a dealer candidate, petitioner and Mr. Howard's credentials and plans were considered on their own merit.

The procedure for obtaining Chrysler's approval as a new dealer candidate is a lengthy and detailed one.  When applying as a dealer candidate, petitioner and Mr. Howard were required to provide detailed information about their respective backgrounds in the automobile sales industry, financing information, detailed dealership plans, and numerous other documents.  Mr. Howard and the employees and agents of petitioner spent several weeks preparing the necessary documentation and meeting with Chrysler representatives.

Ultimately, Mr. Howard's demonstrated abilities as an automobile dealership manager and petitioner's demonstrated performance in representing other manufacturers resulted in petitioner's approval by Chrysler.

Petitioner's Jeep-Eagle franchise would terminate by its nonperformance of the franchise terms, by voluntary termination

by the franchisee, by Mr. Howard's death, or by his failure to materially participate.

Covenant Not to Compete

The amount paid for the covenant not to compete and the term of the covenant were negotiated separately from the price of the other assets. Prior to negotiating with Mr. Markley, Mr. Howard intuitively calculated the value of Mr. Markley's agreeing not to compete with petitioner. Mr. Howard projected annual gross profits less variable costs for the Jeep-Eagle dealership at approximately $1,996,000, as follows:

| | |
|---|---|
| New vehicle sales | $810,000 |
| Finance and insurance income | 351,000 |
| Used vehicle sales | 222,750 |
| Parts and service | 612,000 |
| | 1,995,750 |

Mr. Howard believed that Mr. Markley could take 25 percent of his business if Mr. Markley competed with him.

At the time of the transaction, petitioner believed that Mr. Markley was a significant competitive threat because: (1) Mr. Markley had very good connections with the Jeep-Eagle factory personnel; (2) Mr. Markley's name was well known in the Oklahoma City metropolitan area; (3) Mr. Markley was from Oklahoma City and was continuing in the automobile business in Oklahoma City after the sale; (4) Mr. Markley's demonstrated sales ability was very good; (5) Mr. Markley's age and background made him a competitive threat; (6) Mr. Markley had good customer relations in the Oklahoma City metropolitan area; and (7) Mr. Markley had superior knowledge of Chrysler and Jeep-Eagle product lines.

Petitioner was fearful that Mr. Markley would be a competitive threat by (1) acquiring a new Jeep-Eagle franchise in a suburb of Oklahoma City (as he had done when he was a Ford dealer in Yukon) (2) acquiring an existing Jeep-Eagle dealership or (3) going to work for an existing competitor.

The covenant not to compete is for a 3-year term and covers Oklahoma, Canadian, Logan, Pottawatomie, Lincoln, and Cleveland Counties. The covenant not to compete does not preclude seller and/or Mr. Markley from competing with petitioner in Kingfisher County, which county is adjacent to Oklahoma County and is less than 15 miles from petitioner's automall, from competing with petitioner by working for or with any dealership, including Jeep-Eagle, for compensation of less than $100,000 per year, or from competing with petitioner by obtaining any franchise other than Jeep-Eagle.

## Deductions for Amortization

For the taxable years 1990, 1991, and 1992, petitioner deducted $163,000, $163,500, and $163,500, respectively, as amortization of the covenant not to compete.

## Respondent's Notice of Deficiency

In the notice of deficiency dated February 2, 1995, upon which this case is based, respondent disallowed petitioner's deduction for amortization of the covenant not to compete for the taxable years 1990 and 1991 to the extent of $121,330 for each year.

OPINION

Respondent determined that the fair market value of the covenant not to compete was $125,000.  Petitioner bears the burden of proof.  Rule 142(a).

A taxpayer generally may amortize intangible assets over their useful lives.  Sec. 167(a); Citizens & S. Corp. v. Commissioner, 91 T.C. 463, 479 (1988), affd. 919 F.2d 1492 (11th Cir. 1990).  To be amortizable, an intangible asset must have an ascertainable value and a limited useful life, the duration of which can be ascertained with reasonable accuracy.  Newark Morning Ledger Co. v. United States, 507 U.S. 546, 556 n.9 (1993).  A covenant not to compete is an intangible asset that has a limited useful life and, therefore, may be amortized over its useful life.  Warsaw Photographic Associates v. Commissioner, 84 T.C. 21, 48 (1985); O'Dell & Co. v. Commissioner, 61 T.C. 461, 467 (1974).

The amount a taxpayer pays or allocates to a covenant not to compete is not always controlling for tax purposes.  Lemery v. Commissioner, 52 T.C. 367, 375 (1969), affd. per curiam 451 F.2d 173 (9th Cir. 1971).  We strictly scrutinize an allocation if the parties do not have adverse tax interests because adverse tax interests deter allocations which lack economic reality.  Wilkof v. Commissioner, 636 F.2d 1139 (6th Cir. 1981), affg. per curiam T.C. Memo. 1978-496; Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970); Roschuni

v. Commissioner, 29 T.C. 1193, 1202 (1958), affd. 271 F.2d 267 (5th Cir. 1959). A covenant not to compete must have "economic reality"; i.e., some independent basis in fact or some relationship with business reality so that reasonable persons might bargain for such an agreement. Patterson v. Commissioner, 810 F.2d 562, 571 (6th Cir. 1987), affg. T.C. Memo. 1985-53; Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); O'Dell & Co. v. Commissioner, supra at 467-468.

Respondent, in the notice of deficiency, determined that the covenant not to compete had a fair market value of $125,000. Petitioner argues that by placing a value on the covenant not to compete respondent has, in effect, conceded the existence of economic reality. In fact, respondent formally concedes, in the reply brief, that the covenant was amortizable and had economic reality; thus the only issue for us to decide is the fair market value of the covenant not to compete.

Value of the Covenant Not to Compete

Neither party called an expert witness to opine on the value of the covenant not to compete.

a. Petitioner's Arguments

Petitioner argues that the covenant was worth well in excess of the $490,000 paid to Mr. Markley. Petitioner calculates the value of the covenant as follows:

> The total amount of gross profit less variable costs as
> projected by Mr. Howard was approximately $1,996,000
> per year. * * * Any reduction in this amount will
> result in a dollar for dollar reduction in the

dealership's income (or increase in the dealership's loss).

*   *   *   *   *   *   *

Mr. Howard projected that the effect of competition by David Markley would be reduction in sales of at least twenty-five percent (25 percent).  A twenty-five percent (25 percent) reduction in sales would equate to a loss of $1,497,000 over the term of the covenant [$1,996,000 x .25 x 3].

Petitioner cites the testimony of Stuart Ray,[3] who was allowed to testify under Rule 143(f)(2) as an expert on the automobile dealership industry's practice of using covenants not to compete:

> Mr. Ray indicated that based upon his experience, practice and industry custom he would estimate lost profit [lost sales] due to competition from a seller [not petitioner specifically] in an Oklahoma City metropolitan dealership such as this one, in the range of twenty percent (20 percent) to twenty-five percent (25 percent).

b.  Respondent's Arguments

Respondent, while admitting that the covenant has some value ($125,000), argues that petitioner has overstated the magnitude of potential lost sales from Mr. Markley competing with petitioner, citing petitioner's strong background in auto sales and established presence in the Oklahoma City market.

---

[3]  Mr. Ray is a C.P.A. and was a partner in an accounting and consulting firm whose clientele consisted of about 400 automobile dealers in 30 States.  Mr. Ray has negotiated over 40 buy-sell agreements; prepared tax returns and financial statements for at least 60 automobile dealerships; and has 17 years of experience working exclusively with automobile dealerships.  Mr. Ray, however, had no personal knowledge of petitioner's transactions and did not opine on the value of the seller's covenant not to compete.

Respondent also argues that the likelihood of competition from Mr. Markley is low, citing the "limited market entry" into the Jeep-Eagle market in Oklahoma City area due to the limited number of Jeep-Eagle franchises allowed by Chrysler in the Oklahoma City market; that Mr. Markley showed no intention of competing and, in fact, left Oklahoma shortly after the sale to pursue a business opportunity in Houston, Texas; and that the covenant allows for significant competition since it only covers the sale of new Jeep-Eagle automobiles and does not cover an adjacent county.

Respondent further argues that petitioner's method of valuing the covenant, in addition to the shortcomings mentioned above, also fails to: discount the stream of payments required under the covenant to reflect the time value of money; and to factor in the effect that amortizing the covenant would have on after tax cash flow--the payments under the covenant being deductible and thus reducing petitioner's income tax liability.

Finally, respondent argues that any amount paid by petitioner in excess of $125,000 (of the disputed $490,000 payment) was for Mr. Markley's agreement to terminate his Jeep-Eagle franchise. Respondent correctly points out that the sale was contingent upon Chrysler's awarding petitioner Mr. Markley's franchise, and petitioner could not obtain Mr. Markley's Jeep-Eagle franchise unless he informed Chrysler that he wished to terminate his franchise.

Conclusions as to Value

It is undisputed that petitioner acquired a covenant not to compete from Mr. Markley that had economic reality.  As to whether petitioner acquired something else of value, Mr. Markley testified as follows at trial:

Q.    And would you have given up this business for nothing?

A.    No.  Would I have given up the business?

Q.    Would you have given up the business, if someone had said, I would like to just take it over, but I am sorry, I can't pay you anything for it.  Would that have been attractive to you?

A.    No.

Q.    What would it have taken for you to agree to that proposition?

A.    To sell the business?

Q.    To turn it over--to sell the business.

A.    Well, it took $500,000 is what it took.

Apart from the $500,000, Mr. Markley received payment from petitioner based on the cost of the new vehicles, the fair market value of the used cars, and the return value for the spare parts. Essentially, payment to Mr. Markley for terminating a profitable business (Markley testified that he personally made a minimum of $120,000 a year) was included in the $500,000, of which $490,000 was allocated to the noncompetition covenant.  We find that a part of the $490,000 was to compensate Mr. Markley for terminating his franchise with Chrysler.

In order to value the covenant, using the methodology adopted by petitioner, we would need to calculate the potential lost business from competition by Mr. Markley and then, as respondent correctly points out, lower that number to reflect the probability of Mr. Markley competing.  Mr. Howard testified to the potential for lost sales.  Mr. Howard's testimony was consistent with Mr. Ray's testimony on this issue.  We realize that Mr. Ray was not testifying specifically about Mr. Markley's covenant; however, it adds to Mr. Howard's credibility that his response was in line with industry norms in the Oklahoma City area.  We note, however, that lost sales in the first year would have to reflect the business reality that whatever form of competition Mr. Markley might engage in, it would take some time to implement.  Using the lower end of the range, 20 percent, and factoring a time lag in the first year, the potential for lost business is approximately $300,000 the first year and $400,000 for each of the following 2 years.

The analysis does not stop at this point.  The potential annual lost business needs to be reduced to reflect the probability of competition taking place during each of the 3 years of the covenant.  See International Multifoods Corp. v. Commissioner, 108 T.C. 25, 47-48 (1997).  In evaluating the probability of competition, we take into account that the covenant was restricted to the sale of new Jeep-Eagle automobiles, which required a franchise from Chrysler.  The value ascribed to the covenant must be further reduced to reflect its

present value.  See <u>International Multifoods Corp. v.</u>
<u>Commissioner</u>, <u>supra</u>.

Petitioner has failed to take these factors into account;
therefore we find that the covenant not to compete was worth less
than the $490,000 claimed by petitioners.  Respondent
underestimated the probability that Mr. Markley would compete as
well as the damage that would be caused by such competition.
Consequently, we find that respondent has underestimated the
value of the covenant not to compete.  Based on the record as a
whole, considering all of the facts and circumstances, we hold
that the covenant not to compete had a value of $300,000.

To reflect the foregoing,

<u>Decision will be entered</u>
<u>under Rule 155</u>.